IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM G.H. STEPHENS V, an                    3:20-cv-00673-BR
individual,

                                                OPINION AND ORDER

        Plaintiff,

v.

D.B. ROBERTS, INC., a
Delaware corporation,

        Defendant.

JOSE A. KLEIN
RUSSELL GEORGE GOMM
Klein Munsinger LLC
1215 S.E. Eighth Avenue
Suite F
Portland, OR 97214
(503) 568-1078

        Attorneys for Plaintiff

LAURA E. ROSENBAUM
RYAN KUNKEL
Stoel Rives LLP
760 S.W. Ninth Ave.
Suite 3000
Portland, OR 97205
(503) 294-9642

        Attorneys for Defendant

**BROWN, Senior Judge.**

This matter comes before the Court on Plaintiff's Motion (#35) for Partial Summary Judgment and Defendant's Cross-Motion (#39) for Summary Judgment.  The Court concludes the record is sufficiently developed, and, therefore, oral argument would not be helpful to resolve this Motion.

For the reasons that follow the Court **GRANTS** Defendant's Motion, **DENIES** Plaintiff's Motion, and **DISMISSES** this matter **with prejudice.**

<u>**BACKGROUND**</u>

The following facts are taken from Plaintiff's Complaint and the parties' materials related to the parties' Cross-Motions for Summary Judgment:

Defendant D.B. Roberts, Incorporated, "is a supplier of specialty hardware, such as fasteners, drawer pulls, rivets, and bolts.  D.B. Roberts is not a manufacturer; [its] core business is the sale and distribution of these products." Decl. of Sandra Solis at ¶ 2.

In July 2005 Defendant hired Plaintiff William G.H. Stephens V as the sole outside (or field) sales representative to operate out of Defendant's four-person Beaverton, Oregon, Office.  Joint Statement of Agreed Facts (JSAF) at ¶ 1-2.  Plaintiff's sales territory was Oregon, southern Washington, and western Idaho.

2 - OPINION AND ORDER

Decl. of Russell Gomm, Ex. A at 5.

Defendant's "sales teams" are

> built out of one or more outside sales people,
> supported by an inside sales team.  The outside
> sales person drives the client relationships, both
> with new business and maintaining [the] customer
> base.  [The outside sales process] starts by
> meeting with potential customers, including by
> knocking on doors to introduce [Defendant] and
> selling them on our products. . . .  Outside
> salespeople maintain and strengthen those
> relationships with regular in-person visits.

Solis Decl. at ¶ 3.  "In contrast, the inside sales team . . .

support[s] outside sales and do[es] all of the day-to-day

transactions for customers.  They respond to customer requests

for quotes, address quality issues, answer customer phone calls,

and reply to customer email. . . .  [The] primary role [of inside

salespersons] is not to grow [the] customer base or generate new

business opportunities" for Defendant.  *Id*. at ¶ 4.

As the sole field sales representative in Defendant's

Beaverton office Plaintiff would "go[] out and meet[] with

customers in person every day" for "40 plus" hours per week.

Gomm Decl., Ex. A at 4.  Plaintiff often met with "20 to 30"

customers per week and had telephone conversations with other

customers.  *Id*.

"Throughout his employment, Plaintiff had a chronic medical

condition called pancreatitis that required him to take leaves of

absence for periods of days or weeks at a time.  Prior to 2019,

Defendant accommodated his leaves."  JSAF at ¶ 4.  In December

3 - OPINION AND ORDER

2018 "Plaintiff began undergoing an approximately year-long series of medical procedures related to his pancreatitis."  JSAF at ¶ 6.

Plaintiff was absent from work on April 15, 2019.  On April 16, 2019, he informed Jennifer Davies,[1] his manager, that "he anticipated returning to work on April 17, 2019."  JSAF at ¶ 9.

Plaintiff did not return to work on April 17, 2019.  On April 18, 2019, Plaintiff called Davies to discuss his absence. Plaintiff described his conversation with Davies as follows:

> Q.   And then do you remember not coming in to work on [April 17, 2019] . . . ?
>
> A.   I think that's the day that I called Jennifer [Davies].
>
> Q.   Okay.  Why did you call Jennifer?
>
> A.   I -- I was -- because of all the procedures and . . . just not feeling well, and not being able to perform my – not feeling like I was a part of the team and holding down my end of the fort, I just -- I needed to spend time to fix myself.
>
> And . . . my wife and I talked about it.  She has been there every step of the way.  And . . . this was an opportunity to fix myself, at least for the long -- short run.
>
> And so I called Jennifer [Davies] and said . . . I'm not pulling my weight, and it's not fair to her and the rest of the teammates, and that I needed to take my time, and told

[1] At all relevant times Davies worked out of Defendant's office in Bothell, Washington.

```
              her that I was putting in my . . .
              notification.

    Q.    What do you mean by that, putting in your
          notification?

    A.    That I was . . . quitting.

    Q.    You told her you wanted to quit?

    A.    Yeah.

    Q.    And what did she say?

    A.    She said no, . . . you can't quit.  I can't
          have you leave, you're too important.  You
          know, you need to – we – she said I'll have a
          conversation with HR and put you on – we'll
          put you on short-term.  I didn't –

                        *  *  *

    A.    I just didn't . . . realize that . . . was an
          option.

    Q.    So she didn't want you to quit?

    A.    No.  She . . . told me that she would not
          accept my resignation.
```

Decl. of Ryan Kunkel, Ex. 1 at 3.

"Shortly after the April 18, 2019 telephone conversation with . . . Davies, Defendant provided Plaintiff with forms related to his leave."  JSAF at ¶ 11.  At some point "[d]uring the week following the April 18, 2019 telephone conversation . . . Defendant also provided Plaintiff with forms from Reliance Standard Life Insurance Company to initiate a short-term disability claim.  The forms indicated that Plaintiff was to return the forms no later than April 30, 2019."  JSAF at ¶ 12.

On April 24, 2019, Donna Hilenski, Defendant's Human
Resources Manager, received an email from the email address of
Plaintiff's wife, Nikki Stephens, regarding Plaintiff's leave of
absence.  After Hilenski received the email, Plaintiff, Nikki
Stephens, and Hilenski spoke on the telephone.  Plaintiff
testified at deposition:

> Q.    Okay.  So here's another document.  Is this
> an email from Nikki [Stephens] to Donna
> [Hilenski], dated April 24, 2019?
>
> A.    No, that . . . came from me from Nikki
> [Stephens's] email.
>
>                         * * *
>
> Q.    So sometimes you'd use Nikki [Stephens's]
> email?
>
> A.    [I]n our first conversation with Donna
> [Hilenski] . . . I had asked her if we could
> use Nikki [Stephens's] email address.  And so
> that's why it came from Nikki's email.
>
> Q.    So did you . . . tell Donna [Hilenski] then
> that sometimes . . . Nikki [Stephens] would
> coordinate with Donna [Hilenski] on your
> behalf?
>
> A.    She . . . had asked me if it was okay for her
> to talk to Nikki [Stephens] from time to
> time, on occasion, whenever they needed to.
> And I . . . gave Donna [Hilenski] permission
> to . . . talk to Nikki [Stephens] about
> anything that they needed to talk about.
>
> Q.    Okay.  So she effectively, you know, had
> authority to act on your behalf?
>
> A.    Yes.
>
> Q.    And did you understand that Donna [Hilenski]
> understood that as well?

> A.   I -- she agreed.  And she was the one that
>      asked the permission from me to have those
>      kinds of conversations with Nikki [Stephens],
>      which I . . . agreed to.

Kunkel Decl., Ex. 1 at 4.

On June 3, 2019, Defendant emailed Nikki Stephens and advised her that Defendant had not received any medical certification for Plaintiff's leave of absence.  JSAF at ¶ 15.

On June 6, 2019, Hilenski spoke with Nikki Stephens "to discuss needed paperwork for Plaintiff's leave."  JSAF at ¶ 17.

On June 18, 2019, "Defendant received a form entitled 'Certification of Health Care Provider for Employee's Serious Health Condition,' . . . dated April 25, 2019 by Plaintiff's doctor, [Todd] Gillingham[, M.D.]."  JSAF at ¶ 18.  Dr. Gillian stated in his April 25, 2019, certification that "[d]ue to arising pancreatic issue [*sic*] [Plaintiff] has experienced an increase in anxiety" and that Plaintiff "was unable to work from April 22, 2019, to 'TBD.'"  JSAF at ¶ 19.  Dr. Gillingham estimated Plaintiff's return-to-work date as 'TBD.'"  JSAF at ¶ 19.

On June 18, 2019, Hilenski sent a "new certification form for Plaintiff's medical provider" to Nikki Stephens.  Defendant requested Plaintiff's medical provider to complete the form, including an "updated return to work date," and to return the form by July 2, 2019.  JSAF at ¶ 20.

On July 8, 2019, Hilenski sent an email to Nikki Stephens

and noted Defendant had not yet received an updated medical certification.

On July 9, 2019, "Defendant received an updated certification form from . . . Dr. Gillingham, dated July 8, 2019." JSAF at ¶ 23. Dr. Gillingham stated: "Due to pancreatic issues, [Plaintiff] is experiencing increased anxiety and was unable to perform customer service and activities of daily living from April 22, 2019 through September 2, 2019." JSAF at ¶ 24.

On July 12, 2019, Nikki Stephens called Hilenski and they discussed Plaintiff's leave of absence. The parties dispute the specific content and details of the telephone conversation.

On July 23, 2019, Hilenski sent Plaintiff a letter in which she notified him:

> Based on the need for extended time off coupled with the fact that you have reached the twelve week FMLA limit, we will not be extending your Leave of Absence. Therefore, your employment with D.B. Roberts will end effective August 2, 2019.
>
> Your end of employment will *not* affect your Short Term Disability through Reliance Standard. This can continue as long as your doctor provides Reliance with the medical documentation they request to show you are continuously disabled and unable to work.

Gomm Decl., Ex. 1 at 55 (emphasis in original).

After Defendant terminated Plaintiff's employment it filled Plaintiff's position with Justin Stephens,[2] another employee in

---

[2] Justin Stephens is Plaintiff's brother.

the Beaverton office, who had been an inside salesperson.
JSAF at ¶ 32.  Justin Stephens's "official start date as a field
sales representative was September 1, 2019."  JSAF at ¶ 34.
Defendant also promoted "its customer service employee to the
now-open inside sales role and posted a position to hire a new
employee to backfill the customer service position in the Oregon
office."  JSAF at ¶ 33.

On March 11, 2020, Plaintiff filed an action against
Defendant in Multnomah County Circuit Court in which he brings
claims for failure to provide reasonable accommodation in
violation of Oregon Revised Statutes § 659A.118, failure to
engage in the interactive process in violation of Oregon Revised
Statutes § 659A.112 and Oregon Administrative Rule § 839-006-
0206(6), and disability discrimination in violation of Oregon
Revised Statutes § 659A.112.

On April 23, 2020, Defendant timely removed the matter to
this Court on the basis of diversity jurisdiction.

On April 9, 2021, Plaintiff filed a Motion for Partial
Summary Judgment.  On May 7, 2021, Defendant filed a Cross-Motion
for Summary Judgment.  The Court took the Motions under
advisement on June 18, 2021.


**STANDARDS**

Summary judgment is appropriate when "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a

material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.


## **DISCUSSION**

As noted, Plaintiff brings claims for failure to provide reasonable accommodation in violation of Oregon Revised Statutes § 659A.118, failure to engage in the interactive process in violation of Oregon Revised Statutes § 659A.112 and Oregon Administrative Rule 839-006-0206(6), and disability discrimination in violation of Oregon Revised Statutes § 659A.112.

In his Motion for Partial Summary Judgment Plaintiff seeks "an order from the Court finding in his favor on all but the

11 - OPINION AND ORDER

damages elements of all of the three claims in his Complaint." Defendants seek summary judgment on all of Plaintiff's claims in their Cross-Motion for Summary Judgment.

**I.   Plaintiff's Claim for Failure to Provide a Reasonable Accommodation in Violation of Oregon Revised Statutes § 659A.118.**

As noted, both parties seek summary judgment in their favor on Plaintiff's claim for failure to provide a reasonable accommodation in violation of Oregon Revised Statutes § 659A.118. Specifically, Plaintiff asserts Defendant failed to engage in the interactive process and to provide a reasonable accommodation. Defendant, in turn, contends it engaged in the interactive process.  In the alternative, Defendant asserts Plaintiff has not established any reasonable accommodation existed, and, therefore, Defendant cannot be liable for any failure to engage in the process.

**A.   The Law**

Oregon Revised Statutes § 659A.118 "is construed consistently with similar provisions of the federal Americans with Disabilities Act of 1990 (ADA).  Therefore, the standard for establishing a *prima facie* case of [failure to accommodate] under Oregon law is identical to that used in cases arising under the federal statute." *Wilson v. Providence Health & Servs. - Or.*, No. 3:14-CV-01091-JE, 2015 WL 4366218, at *10 (D. Or. July 14, 2015)(citing *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237

12 - OPINION AND ORDER

F.3d 1080, 1092 (9th Cir. 2001)).  *See also Barrier v. City of the Dalles*, No. 3:18-CV-1084-AC, 2020 WL 9549996, at *13 (D. Or. Dec. 21, 2020), *report and recommendation adopted*, No. 3:18-CV-1084-AC, 2021 WL 1265203 (D. Or. Apr. 6, 2021)("Disability claims brought under Or. Rev. Stat. §§ 659A.103-659A.144 should 'be construed to the extent possible in a manner that is consistent with any similar provisions of the ADA.'")(quoting Or. Rev. Stat. § 659A.139(1)).

"The ADA's definition of discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the] . . . entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'"  *Copenhaver v. Baxter Int'l, Inc.*, No. 1:19-CV-00079-CWD, 2021 WL 40254, at *4 (D. Idaho Jan. 5, 2021) (quoting 42 U.S.C. § 12112(b)(5)(A); *Dark v. Curry Cty.*, 451 F.3d 1078, 1088 (9th Cir. 2006)).  A plaintiff must show "an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases."  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002).  *See also LeBarron v. Interstate Group, LLC*, No. 2:19-CV-1739 JCM (DJA), 2021 WL 1177792, at *4 (D. Nev. Mar. 26, 2021)("To survive summary judgment, the employee must identify a facially reasonable accommodation.")(citing *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006)).  "Reasonable

accommodations [can] include job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).  When an "employee has made a showing of an accommodation that appears reasonable on its face, the employer must show . . . 'case-specific circumstances that demonstrate undue hardship in the particular circumstances.'" *Copenhaver*, 2021 WL 40254, at *6 (quoting *Barnett*, 535 U.S. at 402).  "Undue hardship [requires] . . . a detailed showing that the proposed accommodation would 'requir[e] significant difficulty or expense.'"  *Copenhaver*, 2021 WL 40254, at *6 (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 221 (2d Cir. 2001)).  The ADA sets out the following factors the Court may consider when determining whether an accommodation would impose an undue hardship:

> (i)  the nature and cost of the accommodation . . .;
>
> (ii) the overall financial resources of the facility . . . involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of

14 - OPINION AND ORDER

> such entity; the geographic separateness,
> administrative, or fiscal relationship of the
> facility or facilities in question to the
> covered entity.

42 U.S.C. § 12111(10)(B).  The court "should weigh the risks and

alternatives, including possible hardships on the employer, to

determine whether a genuine issue of material fact exists as to

the reasonableness of the accommodation."  *Nunes v. Wal-Mart*

*Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999).

### B.  Reasonable Accommodation

Plaintiff alleges Defendant failed to provide a

reasonable accommodation for Plaintiff's disability when it

refused to grant Plaintiff's July 12, 2019, request for a leave

of absence up to and including September 2, 2019.[3]  Defendant, on

the other hand, asserts the accommodation Plaintiff requested (a

leave of absence up to and including September 2, 2019) would

have been an undue hardship on Defendant and, therefore,

Plaintiff has not identified a reasonable accommodation.

To the extent that Defendant contends Plaintiff was not

qualified to perform the essential functions of his job while he

was on leave and, therefore, was not a "qualified individual" as

a matter of law, the Ninth Circuit foreclosed that argument in

---

[3] It is undisputed that Plaintiff never requested any
accommodation other than leaves of absence from April 2019 until
he was terminated on July 23, 2019.  Plaintiff also does not
identify in his Motion any other accommodation that would have
enabled him to do his job.

*Nunes*.  The Ninth Circuit held when an employee's "medical leave [is] a reasonable accommodation, then [his] inability to work during the leave period would not automatically render [him] unqualified." *Nunes*, 164 F.3d at 1247.  *See also Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001)(When "a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA.").  Whether Plaintiff was qualified, therefore, turns on whether his requested continued medical leave until September 2, 2019, was a reasonable accommodation.  *See Casteel v. Charter Commc'ns Inc.*, No. C13-5520 RJB, 2014 WL 5421258, at *4 (W.D. Wash. Oct. 23, 2014)("The focus is not on whether the employee is disabled and unable to work during the period of medical leave or on the date of termination.  The focus is whether a leave of absence (here an extension of an existing leave period) would render the employee able to perform the functions of the employment position without imposing undue hardship on the employer.")(citing *Nunes*, 164 F.3d at 1247)).

"[M]edical leave may be a reasonable accommodation under the ADA." *Nunes*, 164 F.3d at 1247 (citing 29 C.F.R. Part 1630, Appendix).  "Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the

16 - OPINION AND ORDER

employer." *Nunes*, 164 F.3d at 1247 (citing 42 U.S.C. § 12111(9), (10); *Norris v. Allied-Sysco Food Servs., Inc.*, 948 F. Supp. 1418, 1438 (N.D. Cal. 1996)). "Determining whether a proposed accommodation (medical leave in this case) is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." *Nunes*, 164 F.3d at 1247 (citation omitted). "An accommodation may result in undue hardship when there is 'more than a *de minimis* cost to the employer,' including but not limited to additional costs from lost efficiency or higher wages." *Roness v. T-Mobile USA, Inc.*, No. C18-1030-RSM, 2019 WL 2918234, at *5 (W.D. Wash. July 8, 2019)(quoting *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999)). "Undue hardship may also be present when an accommodation would cause more than a *de minimis* impact on coworkers, such as depriving [them] of seniority rights or causing [them] to shoulder the plaintiff's share of potentially hazardous work" or the "most difficult work shifts." *Balint*, 180 F.3d at 1054. *See also Roness*, 2019 WL 2918234, at *5. "[T]he ADA places the burden on the defendant to show that an accommodation would be an undue hardship." *Casteel*, 2014 WL 5421258, at *6 (citing 42 U.S.C. § 12112(b)(5)(A); *Nunes*, 164 F.3d at 1247).

   Defendant asserts Plaintiff has not shown the accommodation he sought was reasonable in light of the fact that

17 - OPINION AND ORDER

Defendant established it would suffer undue hardship if it
continued Plaintiff's leave until September 2, 2019, because
Plaintiff was the only outside salesperson in Defendant's four-
person Beaverton office.  It is undisputed that during
Plaintiff's absence from April 15, 2019, through the date of his
termination on July 23, 2019, Plaintiff's

> three coworkers and Ms. Davies tried to cover
> Plaintiff's job duties while also performing their
> own job duties, which involved office work rather
> than field work.  They found, however, that they
> could not come close to maintaining the schedule
> of in-person customers visits and regular phone
> and email contact with customers that was expected
> of outside sales representatives.

JSAF at ¶ 14.  Davies testified at deposition that she did not
believe in July 2019 that it was "sustainable for my team to
continue to limp along and try to cover for [Plaintiff], because
it was so challenging on my team to be down 25 percent of our
work force."  Kunkel Decl., Ex. 4 at 4.  Davies summarized the
challenges Defendant faced while Plaintiff was on leave from
April 2019 through July 2019, which would have been very
difficult to overcome if Plaintiff took additional leave until
September 2, 2019:

> [Plaintiff] was responsible for face-to-face
> meetings with customers, generating business out
> in the field, driving around, getting -- making
> calls, delivering samples.  Full time out in front
> of customers, that's his job description.  And
> . . . there was only one person to cover that
> whole area.  So to have that missing from our
> territory will eventually be detrimental to sales,
> because we don't have anybody that can just step

> in to that role on an interim basis.  In order to
> put someone into [Plaintiff's] role, that would
> mean I would have to take one of the three
> remaining people in the office, . . . [none] of
> which don't have the skill set. . . .  So I'm left
> with Larry and Justin having to [do] inside sales
> and field sales at the same time.  And if you take
> someone off of their desk that enters the orders
> and answers the phone and put them out in the
> field, then there's no one sitting at that desk to
> answer the phone and enter the orders when someone
> calls.  And it was starting to really take a toll
> in morale and in stress and jobs to be done.  It
> just was very challenging.

Kunkel Decl., Ex. 4 at 4.  Davies explained she and her manager,

Sandra Solis, who was in Defendant's office in Camarillo,

California, "explored options of having inside reps make some

outside sales visits."  Kunkel Decl., Ex. 4 at 4.  Davies

summarized the results of Defendant's attempts to have inside

sales persons do some of the field-sales tasks that Plaintiff

performed:

> There were attempts.  There were sales calls that
> were made.  There were, I believe, samples that
> were delivered. . . .  [T]here's an equity problem
> in asking them to do that.  And the problem is
> inside sales in this company does not make the
> same amount of money as field sales, and there's
> really not an easy way to flip that switch.  You
> can't be half inside, half outside, and your
> commission structure change.  And it is -- on the
> exact same sale, field sales makes over 50 percent
> more in commission than an inside salesperson
> does.  So to ask an inside salesperson to leave
> their desk and go out and do a field sales
> person's job and not have a way to fairly
> compensate them for . . . that . . . not only
> . . . puts me in jeopardy of . . . having
> [Plaintiff] out on leave, [and] having an inside
> salesperson quit on me because they're frustrated
> that . . . they are being unfairly compensated.

19 - OPINION AND ORDER

*Id.*  In addition,

> [e]very minute [the inside sales representatives]
> spent doing outside sales tasks was a minute they
> could not respond to customers' phone calls or
> emails, process a customer's order, or do their
> other inside sales or customer service work.  The
> inside sales team is extraordinarily busy even
> with someone in field sales.  Trying to perform
> both jobs at the same time was too much and things
> were left undone or done late.

Decl. of Jennifer Davies at ¶ 6.  In fact, Plaintiff testified at

deposition that inside sales representatives "wouldn't be able to

go out and spend . . . 40 hours a week on the road meeting with

[Defendant's] customers while still doing . . . their job."

Kunkel Decl., Ex. 1 at 4.

Davies also explained it was not feasible to have one

of the inside sales representatives fill Plaintiff's position and

to hire a temporary employee to fill the inside sales

representative job:

> Q.  And I know you described before that it's
>     difficult . . . to have someone move between
>     the inside and the outside positions. . . .
>     Would you say that's the main reason why it
>     wouldn't work to have Justin only temporarily
>     as the outside rep?
>
> A.  Well, . . . yes.  And for everybody in the
>     chain, right?  So you move Jenny into inside
>     salespeople and then you put her back into
>     customer service and she loses a significant
>     amount of money.  And Justin's no longer
>     happy being in his position because he now
>     sees exactly how much money [Plaintiff] makes
>     and he's feeling disgruntled.  It's just --
>     it would have decimated that branch and I
>     don't think I would have had a single
>     employee left.

Kunkel Decl., Ex. 4 at 5.  Davies also testified she "looked at the sales and the bookings" during the time Plaintiff was on leave and she saw "a dip in the . . . bookings[, which] . . . reflect the day-to-day sales that come into" the office.  Kunkel Decl., Ex. 4 at 4.  In addition, during Plaintiff's absence a vendor wanted a field sales representative to join "the vendor on a three-day joint sales trip in Boise, Idaho"; however, "nobody could take three days away from their own jobs to go on the trip. As a result, [Defendant] lost out on the opportunity to meet with numerous customers, deepen those customer and vendor relationships, and potentially make new sales and expand our business."  Davies Decl. at ¶ 8.

> Finally, Davies's

> personal stress level increased significantly during [Plaintiff's] absence.  I was trying to juggle my own job and help support the inside sales team's efforts to cover field sales, and it was overwhelming.  I had already been experiencing health problems, including heart palpitations, and taking medication, but the stress I felt due to [Plaintiff's] absence exacerbated my condition, and I had to increase my medication to help manage my health.  The stress and additional burden of having 25% of my team out of the office - especially the 25% that represented the most critical part of the team for generating business - was not sustainable for me.

Davies Decl. at ¶ 8.

> Plaintiff does not dispute his absence caused difficulty for his coworkers and manager.  In fact, Plaintiff testified at deposition that his coworkers would not be able to

21 - OPINION AND ORDER

do his job in addition to their own jobs.  Plaintiff, however,
asserts Defendant has not established it would suffer "any
hardship *from granting Plaintiff's requested accommodation*."
Pl.'s Reply in Support of Mot. for Partial Summary Judgment at 2
(emphasis in original).  Specifically, Plaintiff contends
"whatever hardship Defendant would have suffered if it granted
Plaintiff's requested accommodation" of additional leave to
September 2, 2019, "was identical to the hardship it actually did
suffer *even though it denied his accommodation*" because Justin
Stephens's "official start date as a field sales representative
was September 1, 2019," which is only one day before the date on
which Plaintiff's requested additional leave would have ended.
Pl.'s Reply in Support of Mot. for Partial Summary Judgment
at 2-3 (emphasis in original).  According to Plaintiff,
therefore, Defendant cannot establish it would have suffered
undue hardship if it had granted Plaintiff's requested
accommodation.

        Defendant, however, points out that on July 23, 2019,
which is the same day that Defendant laid off Plaintiff, Davies
and Solis

>           met with Justin Stephens to talk to him about
>           moving from inside sales to outside sales.  He
>           agreed to do so, and we immediately began to plan
>           to transition Justin Stephens out of his old role
>           and into his new role.  That involved Justin
>           Stephens training his replacement, a current
>           employee who had been working in customer
>           relations[,] and hiring a fourth employee for the

> [Beaverton] office. . . . [The] transition
> process, along with negotiating the terms and
> conditions of [Justin Stephens's] new role, took
> several weeks.  We made him an official "offer" to
> become the outside salesperson on August 21, 2019,
> and his official start date was September 1, 2019,
> even though we had been transitioning him into
> that role since July.

Davies Decl. at ¶ 14.  Solis explains in her Declaration:

> Justin Stephens was the best person for the [field
> sales] job.  [Defendant] needed someone in outside
> sales right away, and hiring someone from outside
> the Company would have taken too long, not to
> mention the amount of time it would have taken to
> train the person.  [Justin Stephens] already had a
> working knowledge of the Company's practices and
> we felt that his skill set was well-suited to
> outside sales.  Though we wanted Justin Stephens
> to officially start in outside sales immediately
> . . . [w]e had to get formal approval from upper
> management to hire Justin Stephens, his internal
> replacement, and a new employee, all of which took
> time. . . .  It took several weeks before the
> Company was in a place to formally offer Justin
> Stephens the job – which we did on August 21 – but
> the Company started preparing for Justin Stephens
> to take that role immediately after letting
> Plaintiff go.

Solis Decl. at ¶ 12.

Plaintiff does not offer or point to any evidence in
the record that contradicts the testimony of Davies and Solis.
The record reflects even though Justin Stephens did not
officially start as an outside salesperson until September 1,
2019, he had undergone training and began to perform field sales
duties before September 1, 2019.  In addition, Plaintiff does not
point to any evidence that Defendant knew when it denied
Plaintiff's July 2019 request for additional leave that it would

23 - OPINION AND ORDER

take until September 1, 2019, for Justin Stephens officially to
become the field sales representative.  In fact, the record
reflects in July 2019 Davies and Solis "needed someone in outside
sales right away," and Solis was aware that "hiring someone from
outside . . . would have taken too long."  Moreover, the Ninth
Circuit has made clear the fact that Defendant granted
Plaintiff's April 2019 request for leave does not render
Plaintiff's July 2019 request for additional leave reasonable.
*See Leighton v. Three Rivers Sch. Dist.*, 693 F. App'x 662, 663
(9th Cir. 2017)("'An institution's past decision to make a
concession to a disabled individual does not obligate it to
continue to grant that accommodation in the future, nor does it
render the accommodation reasonable as a matter of law.'")
(quoting *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 820 (9th
Cir. 1999)).

      As noted, courts have held "[a]n accommodation may
result in undue hardship when there is 'more than a *de minimis*
cost to the employer,' including but not limited to additional
costs from lost efficiency or higher wages."  *Roness*, 2019 WL
2918234, at *5 (quoting *Balint*, 180 F.3d at 1054).  "Undue
hardship may also be present when an accommodation would cause
more than a *de minimis* impact on coworkers, such as depriving
[them] of seniority rights or causing [them] to shoulder the
plaintiff's share of potentially hazardous work" or the "most

difficult work shifts." *Balint*, 180 F.3d at 1054; *Roness*, 2019
WL 2918234, at *5.  The Court finds Defendant has established it
would have suffered undue hardship in the form of lost business,
a greater than *de minimus* impact on Plaintiff's coworkers, and
increased health problems for Plaintiff's manager if it had
granted Plaintiff's July 2019 request for an additional leave of
absence until September 2, 2019.  The Court, therefore, also
concludes Plaintiff has not established his request for an
additional leave of absence was a reasonable accommodation.

Accordingly, the Court denies Plaintiff's Motion for
Partial Summary Judgment as to his claim for failure to provide
reasonable accommodation in violation of Oregon Revised Statutes
§ 659A.118 and grants Defendant's Cross-Motion for Summary
Judgment on that claim.

**II.  Plaintiff's Claim for Failure to Engage in the Interactive Process in Violation of Oregon Revised Statutes § 659A.112 and Oregon Administrative Rule 839-006-0206(6).**

Plaintiff asserts Defendant failed to engage in the
interactive process in violation of Oregon Revised Statutes
§ 659A.112 and Oregon Administrative Rule 839-006-0206(6).
Specifically, Plaintiff alleges he "had a disability that was
known to Defendant[,] . . . Plaintiff requested reasonable
accommodation for his condition[, and] . . . Plaintiff was
willing to participate in an interactive process to determine
whether reasonable accommodation could be made so that he would

be able to perform the essential requirements of his job."
Compl. at ¶¶ 28-29.  In its Cross-Motion Defendant asserts it
engaged sufficiently in the interactive process, and, in any
event, it is not liable even if it failed to do so because there
was not any possible reasonable accommodation.

    **A.**   **The Law**

As with Oregon Revised Statutes § 659A.118, Oregon
Revised Statutes § 659A.112 "is construed consistently with
similar provisions of the federal Americans with Disabilities Act
of 1990 (ADA)."  *See Barrier*, 2020 WL 9549996, at *13
("Disability claims brought under Or. Rev. Stat. §§ 659A.103-
659A.144 should 'be construed to the extent possible in a manner
that is consistent with any similar provisions of the
ADA.'")(quoting Or. Rev. Stat. § 659A.139(1)).

"'[R]easonable accommodation' requires an employer 'to
initiate an informal, interactive process with the individual
with a disability in need of the accommodation' to 'identify the
precise limitations resulting from the disability and potential
reasonable accommodations that could overcome those
limitations.'"  *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1193
(9th Cir. 2021)(quoting 29 C.F.R. § 1630.2(o)(3) and citing
*Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)).  "An
employer who fails to engage in the interactive process would
face liability if a reasonable accommodation would have been

possible." *Howard*, 988 F.3d at 1193 (quotation omitted).

"[L]iability . . . depends on whether a reasonable accommodation

was possible, not merely on the failure to engage in the

interactive process." *Id.* at 1095. *See also Dunlap v. Liberty*

*Nat. Prods., Inc.*, 3:12-cv-01635-SI, 2015 WL 1778477, at *13 (D.

Or. Apr. 20, 2015)(applying same analysis to the plaintiff's

reasonable accommodation claim under Oregon Revised Statutes

§ 659A.112 consistent with any similar provisions of the ADA).

Oregon Administrative Rule 839-006-0206(6) provides:

> A meaningful interactive process is a mandatory
> step in the reasonable accommodation of a
> qualified employee or applicant with a disability.
> Failure of an employer to engage in a meaningful
> interactive process with a qualified employee or
> applicant with a disability who has requested
> reasonable accommodation or has otherwise
> disclosed to the employer a disability that may
> require reasonable accommodation is a failure to
> reasonably accommodate in violation of ORS
> 659A.112(2)(e).

Oregon Administrative Rule 839-006-0206(5), however, limits the

remedies that may be awarded against an employer that fails to

engage in the interactive process when a reasonable accommodation

would not have been possible:

> The commissioner [of the Oregon Bureau of Labor
> and Industries] may order the respondent to
> eliminate the effects of any unlawful practice
> found and may require respondent to:
>
> (a) Perform a designated act or series of acts
> that are calculated to carry out the policy of
> these rules in order to eliminate the effects of
> an unlawful practice and to protect the rights of
> those affected;

27 – OPINION AND ORDER

(b) Take action and submit reports to the commissioner on the manner of compliance with the terms and conditions specified in the commissioner's order or agreement;

(c) Refrain from any action prohibited by the order or agreement that would jeopardize the rights of the individuals or groups named in the complaint or would frustrate the purpose and the policy of these rules and relevant statutes.

### B.    Communications with Nikki Stephens

Plaintiff asserts Defendant did not engage in the interactive process as required because "[a]fter Plaintiff went out on leave, Defendant kept all of its considerations to itself and did not once discuss with Plaintiff whether he would be able to return to work at a time that would meet Defendant's needs." Pl.'s Mot. for Partial Summary Judgment at 11.  Specifically, Plaintiff notes Defendant spoke only to Nikki Stephens about Plaintiff's leave after the April 24, 2019, conversation between Plaintiff, Nikki Stephens, and Hilenski.  To satisfy the interactive-process requirement, Plaintiff contends Defendant was required to speak to him personally.

Defendant, however, notes Plaintiff conceded at deposition that Plaintiff told Hilenski during the April 24, 2019, conversation that he "gave [Hilenski] permission to . . . talk to Nikki [Stephens] about anything that they needed to talk about" regarding his leave.  Kunkel Decl., Ex. 1 at 7.  Plaintiff testified Nikki Stephens "effectively . . . had authority to act on [his] behalf" and that Plaintiff "underst[ood] that [Hilenski]

28 - OPINION AND ORDER

understood" Nikki Stephens had the authority to act on

Plaintiff's behalf.  *Id.*  In addition, Nikki Stephens testified

about the time Plaintiff was on leave as follows:

> Q.   And during that time you were the company's
>      primary contact with Mr. Stephens; is that
>      correct?
>
> A.   Yes.  And by primary . . . contact, only because
>      we were using my email, which is on my home
>      computer.
>
>                           * * *
>
> Q.   Did Mr. Stephens ever use your email to coordinate
>      with the company?
>
> A.   I am sure he did.
>
>                           * * *
>
> Q.   Do you know whether he did?
>
> A.   Not a hundred percent certain, no.
>
> Q.   And you did as well, right?
>
> A.   From my email address, yes.
>
> Q.   When you coordinated with the company using your
>      email address, would you say that you were
>      . . . speaking on behalf of [Mr. Stephens]?
>
> A.   No, I would say I was speaking with him.  Because
>      in 99 percent of the time that . . . we were
>      corresponding with the company, it was something
>      that he and I discussed, and we just responded
>      from my email address.
>
> Q.   Okay. You said 99 percent.  What about the other
>      one percent?
>
> A.   I did things like check in with [Hilenski] to
>      ensure that she had received paperwork that she
>      had requested, or I had reached out to a doctor to
>      make sure that they did whatever they needed to

do.

* * *

Q.    Do you think that you understood the paperwork
      process better than [Mr. Stephens] did?

A.    I . . . can't say whether I did or whether I
      didn't, I can just say that he was of the opinion
      that I did.

Q.    Okay.  And why was [Mr. Stephens] of the opinion
      that you understood the process better than him?

A.    I do not know.  I didn't even ask him.

Q.    Are you involved at all with . . . administering
      leaves as part of your job?

A.    I am involved in human resources and -- but not on
      my own, I use the help of an employment attorney.

Q.    So you're familiar with general HR processes?

A.    General as it pertains to my company's situation,
      yes.

Q.    Does that include leaves of absence?

A.    It could.

Q.    Could it also include reasonable accommodations
      under the Americans with Disabilities Act?

A.    It could.

Kunkel Decl., Ex. 2 at 3.  Hilenski testified in her Declaration

that she understood from Plaintiff's statements during the

April 24, 2019, conversation that Nikki Stephens "had authority

to act on Plaintiff's behalf when it came to any issue related to

his medical condition or leave of absence."  Hilenski Decl. at

¶ 2.  In addition, Hilenski stated she "communicated numerous

times with Ms. Stephens through email or over the phone about

Plaintiff's medical condition and his leave of absence. . . .

I tried to call Plaintiff directly a couple of times, but he did

not answer or return my calls."  Declaration of Donna Hilenski

at ¶ 4.  Davies testifies in her Declaration that "[d]uring

[Plaintiff's] leave, to my knowledge, he did not communicate

directly with anyone at the Company about his leave. . . .  I

heard from him directly early on during his leave when we

discussed how to forward his work emails to me, but I did not

hear from him after that."  Davies Decl. at ¶ 4.

Plaintiff does not dispute Defendant had several

conversations with Nikki Stephens about both Plaintiff's initial

leave and about his July 2019 request for additional leave.

Plaintiff also does not dispute he gave Defendant "permission to

speak with Plaintiff's wife regarding his leave."  Pl.'s Mot. for

Partial Summary Judgment at 11.  Moreover, Plaintiff does not

cite any authority for his assertion that an employer fails to

engage in the interactive process when it interacts with an agent

of the employee rather than the employee himself, particularly

when the employee does not respond to the employer's attempts at

communication.  In fact, courts have found employers did not fail

to engage in the interactive process when the employer spoke only

to an employee's wife.  *See, e.g., LeBarron v. Interstate Grp.,*

*LLC*, No. 219CV1739JCMDJA, 2021 WL 1177792, at *5 (D. Nev.

31 – OPINION AND ORDER

Mar. 26, 2021)(employer communicated exclusively with the
plaintiff's wife about the plaintiff's need for a leave of
absence and the date when the plaintiff expected to return to
work).

The Court, therefore, concludes Defendant has
established on this record that Nikki Stephens was authorized to
act for Plaintiff with respect to communicating with Defendant
about Plaintiff's medical condition, requested accommodation, and
his leaves of absence and that Defendant understood Nikki
Stephens was authorized to act in that capacity.  Accordingly,
the Court also concludes Plaintiff has not established a genuine
dispute of material fact exists as to Defendant's failure to
engage in the interactive process because Defendant spoke to
Nikki Stephens rather than to Plaintiff.

## C.    Continued Interactions

Plaintiff asserts Defendant also failed to engage in
the interactive process when it failed to discuss with Plaintiff
"Defendant's need for [Plaintiff] to return to work sooner than
September, whether there might be a middle ground for
accommodating Plaintiff's request for accommodation, or any other
issue with Plaintiff's request."  Pl.'s Opp'n to Defendant's Mot.
for Summary Judgment.  The record, however, reflects Hilenski
called and spoke to Nikki Stephens on the telephone after
Hilenski received Plaintiff's July 9, 2019, request for

additional leave through September 2, 2019.  Although the exact substance of the conversation is disputed, Plaintiff does not dispute that neither Nikki Stephens nor Plaintiff requested any accommodation other than a continued leave of absence to September 2, 2019, which Defendant has shown would have been an undue hardship.  In addition, the Court has already concluded Defendant has established it was reasonable for it to speak to Nikki Stephens in her capacity as Plaintiff's agent.  Finally, the record does not contain any evidence from which this Court could infer there was some other accommodation that would have permitted Plaintiff to do his job nor is there any indication that Plaintiff could have returned to work before September 2, 2019.  In fact, Plaintiff testified at deposition that he did not believe he could have returned to his job until "shortly after [his] last procedure in November 2019."  Kunkel Decl., Ex. 1 at 5.  Thus, Defendant has established on this record that a reasonable accommodation was not "possible."

The Court, therefore, also concludes Defendant has established it engaged in the interactive process to the extent possible and any further interaction would have been futile in light of the fact that there was not a possible reasonable accommodation.  *See Shepherd v. Kohl's Dep't Stores, Inc.*, No. 114CV01901DADBAM, 2016 WL 4126705, at *5 (E.D. Cal. Aug. 2, 2016)("To the extent the only remedy sought by plaintiff from the

interactive process was one this court cannot force defendant to accept[,] . . . this claim must fail.  It would be futile to compel a process seeking only a result the employer could not be made to accept."). *See also Swonke v. Sprint, Inc.*, 327 F. Supp. 2d 1128, 1137 (N.D. Cal. 2004)("The Court cannot impose upon the employer an obligation to engage in a process that was guaranteed to be futile.").

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claim for failure to engage in the interactive process and denies Plaintiff's Motion for Partial Summary Judgment on that claim.

## III. Plaintiff's Claim for Disability Discrimination in Violation of Oregon Revised Statutes § 659A.112.

Plaintiff moves for summary judgment in his favor on his claim for disability discrimination in violation of Oregon Revised Statutes § 659A.112, and Defendant moves for summary judgment in its favor on this claim.

### A.    The Law

Oregon Revised Statutes § 659A.112(1) provides:  "It is an unlawful employment practice for any employer to . . . discharge [an individual] from employment . . . on the basis of disability."  Generally when "analyzing claims of . . . employment discrimination in violation of either state or federal law, federal courts apply the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)."

34 - OPINION AND ORDER

*Wilson*, No. 3:14-CV- 01091-JE, 2015 WL 4366218, at *10 (citing *Snead*, 237 F.3d at 1092).  When, however, "the plaintiff's disability was clearly a factor in the adverse action taken by the employer, the central issue becomes whether the employer failed to reasonably accommodate the plaintiff's disability," and the Court should evaluate the plaintiff's claim "within [the] 'failure to accommodate' framework." *Reza v. IGT*, No. 3:06-CV-00211-BESVPC, 2008 WL 2048357, at *2 (D. Nev. May 12, 2008).

**B.   Failure-to-Accommodate Framework Applies**

Defendant asserts Plaintiff's disability was not "clearly a factor" in its decision to terminate Plaintiff, and, therefore, the Court should apply the *McDonnell Douglas* analytical framework to Plaintiff's claim for disability discrimination.  Specifically, Defendant asserts the record reflects Defendant "terminated Plaintiff because [it] could no longer accommodate his absence, which was causing an undue hardship - not because of his medical condition."  The Ninth Circuit, however, has made clear that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey*, 239 F.3d at 1139-40.  Plaintiff has presented evidence that his leave of absence was caused by his disability, and Defendant does not dispute that evidence.  Thus, the Court concludes Plaintiff has established his disability was a factor in the adverse action

taken by Defendant.  The Court, therefore, concludes "the central issue becomes whether [Defendant] failed to reasonably accommodate [Plaintiff's] disability."  Accordingly, the Court applies the failure-to-accommodate analytical framework to Plaintiff's disability-discrimination claim.

Under the failure-to-accommodate analytical framework a plaintiff must identify "an accommodation [that] seems reasonable on its face."  *Barnett*, 535 U.S. at 401-02.  *See also LeBarron*, 2021 WL 1177792, at *4 ("To survive summary judgment, the employee must identify a facially reasonable accommodation.") (citing *Dark*, 451 F.3d at 1088).  When an "employee has made a showing of an accommodation that appears reasonable on its face, the employer must show . . . 'case-specific circumstances that demonstrate undue hardship in the particular circumstances.'" *Copenhaver*, 2021 WL 40254, at *6 (quoting *Barnett*, 535 U.S. at 402).  "Undue hardship [requires] . . . a detailed showing that the proposed accommodation would 'requir[e] significant difficulty or expense.'"  *Copenhaver*, 2021 WL 40254, at *6 (quoting *Lovejoy-Wilson*, 263 F.3d at 221).

**C.  Analysis**

The Court has already concluded Defendant has established it would have suffered undue hardship in the form of lost business, a greater than *de minimus* impact on Plaintiff's coworkers, and increased health problems for Plaintiff's manager

if it had granted Plaintiff's July 2019 request for an additional leave of absence until September 2, 2019.  The Court, therefore, concluded Plaintiff has not shown his request for an additional leave of absence was a reasonable accommodation.  Thus, Plaintiff has not established he was a qualified individual who could perform the essential functions of the job with or without reasonable accommodation.

Accordingly, the Court denies Plaintiff's Motion for Partial Summary Judgment as to his claim for disability discrimination in violation of Oregon Revised Statutes § 659A.112 and grants Defendant's Cross-Motion for Summary Judgment on that claim.


## CONCLUSION

For these reasons, the Court **DENIES** Plaintiff's Motion (#35) for Partial Summary Judgment, **GRANTS** Defendant's Cross-Motion (#39) for Summary Judgment, and **DISMISSES** this matter **with**

**prejudice.**

IT IS SO ORDERED.

DATED this 27th day of July, 2021.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge

38 - OPINION AND ORDER